No. 20-50296

# In the United States Court of Appeals for the Fifth Circuit

In re Greg Abbott, in his official capacity as Governor of Texas; Ken Paxton, in his official capacity as Attorney General of Texas; Phil Wilson, in his official capacity as Acting Executive Commissioner of the Texas Health and Human Services Commission; Stephen Brint Carlton, in his official capacity as Executive Director of the Texas Medical Board; and Katherine A. Thomas, in her official capacity as the Executive Director of the Texas Board of Nursing,

*Petitioners.*

On Petition for Writ of Mandamus to the United States District Court for the Western District of Texas, Austin Division

## REPLY IN SUPPORT OF PETITION FOR WRIT OF MANDAMUS

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

Ryan L. Bangert
Deputy First Assistant
  Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Kyle D. Hawkins
Solicitor General
Kyle.Hawkins@oag.texas.gov

Heather Gebelin Hacker
Beth Klusmann
Natalie D. Thompson
Assistant Solicitors General

Counsel for Petitioners

# TABLE OF CONTENTS

Page

Table of Authorities ...................................................................................iii

Reply in Support of Mandamus Petition ................................................ 1

Argument .................................................................................................... 2

    I.   The District Court Clearly and Indisputably Erred. ................... 2

        A.   The TRO reached a patently erroneous result as to
            medication abortions regardless of whether GA-09 applies to
            those procedures. ....................................................................... 2

            1.   The district court ignored the "beyond question" standard
                and based its TRO on already-rejected evidence. .......................... 3

            2.   Any ambiguity in GA-09's scope as to medication abortions
                renders the TRO all the more impermissible. ................................ 6

        B.   The TRO patently erred as to gestational-limit abortions. ................... 9

        C.   The district court again failed to properly address
            jurisdictional defects, despite this Court's instruction. ..................... 11

    II.  The District Court's Refusal To Follow The Mandate Rule And
           The Law-Of-The-Case Doctrine Independently Justifies
           Mandamus Relief. ..................................................................... 12

    III. The Court Should Grant Mandamus Relief. ........................... 14

Conclusion ................................................................................................ 16

Certificate of Service ............................................................................... 17

Certificate of Compliance ....................................................................... 17

# Table of Authorities

Page(s)

**Cases:**

*In re Abbott*,
No. 20-50264, 20 WL 1685929 (5th Cir. Apr. 7, 2020) ...... 3, 5, 6, 8, 10, 11, 13-14

*Ball v. LeBlanc*,
881 F.3d 346 (5th Cir. 2018)..............................................................................12

*Cheney v. U.S. Dist. Court for D.C.*,
542 U.S. 367 (2004) .......................................................................................7, 11

*Citibank, N.A. v. Fullam*,
580 F.2d 82 (3d Cir. 1978) .................................................................................13

*Dep't of Navy v. Fed. Labor Relations Auth.*,
835 F.2d 921 (1st Cir. 1987)...............................................................................13

*In re Depuy Orthopaedics, Inc.*,
870 F.3d 345 (5th Cir. 2017)..............................................................................15

*Deutsche Bank Nat'l Trust Co. v. Burke*,
902 F.3d 548 (5th Cir. 2018) (per curiam).........................................................12

*In re Gee*,
941 F.3d 153 (5th Cir. 2019) (per curiam)..................................................... 11, 15

*Gen. Atomic Co. v. Felter*,
436 U.S. 493 (1978)...................................................................................1, 2, 14

*Gonzales v. Carhart*,
550 U.S. 124 (2007) ............................................................................................3

*Hughes v. Savell*,
902 F.2d 376 (5th Cir. 1990) ...............................................................................7

*Hutto v. Davis*,
454 U.S. 370 (1982) (per curiam) ......................................................................12

*In re JPMorgan Chase & Co.*,
916 F.3d 494 (5th Cir. 2019)..............................................................................15

*Lake Carriers Ass'n v. MacMullan*,
406 U.S. 498 (1972) ............................................................................................8

*Lewis v. Casey*,
518 U.S. 343 (1996) ..........................................................................................11

*In re MidAmerican Energy Co.*,
  286 F.3d 483 (8th Cir. 2002) (per curiam) ....................................... 12

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
  491 U.S. 350 (1989) ...................................................................... 8

*Pennhurst State Sch. and Hosp. v. Halderman*,
  465 U.S. 89 (1981) ........................................................................ 7

*Planned Parenthood of Southeastern Pennsylvania v. Casey.*,
  505 U.S. 833 (1992) ...................................................................... 9

*R.R. Comm'n v. Pullman Co.*,
  312 U.S. 496 (1941) ...................................................................... 8

*Reetz v. Bozanich*,
  397 U.S. 82 (1970) ........................................................................ 8

*Roe v. Wade*,
  410 U.S. 113 (1973) ................................................................... 3, 9

*Sierra Club v. City of San Antonio*,
  112 F.3d 789 (5th Cir. 1997) ......................................................... 8

*In re United States*,
  207 F.2d 567 (5th Cir. 1953) ....................................................... 12

*U.S. Parole Comm'n v. Geraghty*,
  445 U.S. 388 (1980) ...................................................................... 8

*Vendo Co. v. Lektro-Vend Corp.*,
  434 U.S. 425 (1978) ........................................................... 1, 12, 14

*Yarls v. Bunton*,
  905 F.3d 905 (5th Cir. 2018) ......................................................... 8

**Constitutional Provisions and Statute:**
U.S. Const. amend.
  I ................................................................................................ 10
  XI ............................................................................................... 7
Tex. Health & Safety Code § 171.044 ................................................ 9

**Other Authorities:**
ACOG, *Examples of Alternative or Reduced Prenatal Care Schedules*
  (Mar. 24, 2020), https://www.acog.org/clinical-
  information/physician-faqs/-/media/287cefdb936e
  4cda99a683d3cd56dca1.ash ........................................................... 5

iv

ACOG, *Medical Management of First-Trimester Abortion, Practice Bulletin 143* (2016), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2014/03/medical-management-of-first-trimester-abortion ............................................................ 5

FDA, *Risk Evaluation and Mitigation Strategies*, https://www.fda.gov/drugs/drug-safety-and-availability/risk-evaluation-and-mitigation-strategies-rems .................................................................................................... 4

Mifeprex label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf .......................................................................................... 6

Mifeprex REMS, https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2019_04_11_REMS_Document.pdf ............................ 4

Order, *Planned Parenthood Center for Choice v. Abbott*, No. 1:20-CV-00323-LY (W.D. Tex., issued Apr. 14, 2020) .............................................. 15

Tex. Dep't of State Health Servs., *Texas Case Counts COVID-19*, https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b 4298ab01e8b9cafc8b83 ............................................................ 15

*Texas Medical Board (TMB) Frequently Asked Questions (FAQs) Regarding Non-Urgent, Elective Surgeries and Procedures During Texas Disaster Declaration for COVID-19 Pandemic* 3, http://www.tmb.state.tx.us/idl/59C97062-84FA-BB86-91BF-F9221E4DEF17 .................................................................................................... 5

Tr. of Telephone Call 7:12-8:21, *Planned Parenthood Center for Choice v. Abbott*, No. 1:20-cv-00323-LY (W.D. Tex. Apr. 9, 2020) .......................... 14

## Reply in Support of Mandamus Petition

This Court's previous orders in this case establish that the district court's second TRO is patently impermissible in ways that require immediate mandamus relief. The district court manifestly erred in three core ways:

*First,* it disregarded this Court's analysis of the framework governing emergency public-health measures like GA-09. And it did not permit Petitioners to submit evidence. Instead, it considered the same evidence that led this Court to invalidate the first TRO. The result is patently erroneous as to medication abortions, women nearing 18 weeks, and women nearing 22 weeks.

*Second,* the district court again acted before considering standing and sovereign immunity. It ignored this Court's admonishment to consider whether relief against the Attorney General and Governor is available. The second TRO manifestly exceeds the district court's jurisdiction. Respondents admit (at 32) that mandamus is available "when the trial court has 'exceeded its jurisdiction.'"

*Third,* the district court's violation of the mandate rule and law-of-the-case doctrine is an independent basis on which to grant mandamus relief. It is well settled that mandamus should issue when a lower court "refuse[s] or fail[s] to comply" with an appellate court's judgment, *Gen. Atomic Co. v. Felter*, 436 U.S. 493, 497 (1978) (per curiam), or "disobeys and mistakes [the mandate's] meaning," *Vendo Co. v. Lektro-Vend Corp.*, 434 U.S. 425, 427 (1978) (per curiam). That is the case here: the Court should assert its authority to compel compliance with its mandate.

Respondents fail to defend the district court's manifest errors. They rehash arguments and evidence this Court already has rejected. Mandamus should issue.

A R G U M E N T

## I.  The District Court Clearly and Indisputably Erred.

This Court just identified the numerous errors in the district court's opinion. The district court's TRO:

- Does not discuss or apply "the framework governing emergency public health measures like GA-09," established by the Supreme Court in *Jacobson*,

- Does not "careful[ly] pars[e] . . . the evidence," developed after a hearing at which "all parties [would] presumably have the chance to present evidence on the validity of applying GA-09 in specific circumstances," and

- Persists in "usurp[ing] the state's authority to craft emergency health measures" by "substitut[ing] [the court's] own view of the efficacy of applying GA-09 to abortion."

Order Denying Stay 3-4 (citations omitted).

Those errors permeate the second TRO and require mandamus relief.

### A.  The TRO reached a patently erroneous result as to medication abortions regardless of whether GA-09 applies to those procedures.

Mandamus relief should issue as to the portion of the TRO enjoining enforcement of GA-09 as to medication abortions. The district court concluded as a legal matter that enforcement of GA-09 as to medication abortions violates the Fourteenth Amendment. It further copied, as a factual matter, Respondents' proposed finding that "[m]edication abortion is not a surgery or procedure." App.469; *see also* App.268, 448. Petitioners—some of whom have enforcement power—insist that

2

GA-09 applies to medication abortions, and that the TRO enjoining such enforcement is patently erroneous. But even if GA-09 does not cover medication abortion, that only *intensifies* the district court's error in entering extraordinary relief, far beyond its jurisdiction, where none was necessary.

### 1. The district court ignored the "beyond question" standard and based its TRO on already-rejected evidence.

This Court's previous decisions were clear: injunctive relief is available only when the evidence in the record makes it "beyond question" that GA-09 violates the right to abortion. The district court failed to engage that standard.

**a.** First, the evidence does not show that temporarily delaying medication abortions "beyond question" violates the Constitution. There is no constitutional right to a preferred method of abortion, so the fact that some women may later require a surgical abortion cannot be an undue burden. *See Gonzales v. Carhart*, 550 U.S. 124, 163-65 (2007); *see also Roe v. Wade*, 410 U.S. 113, 153 (1973) (stating that a woman does not have the right to an abortion "in whatever way" she chooses). Moreover, women eligible for medication abortion must be less than ten weeks' gestation, giving them months to obtain an abortion after expiration of GA-09. The district court's refusal to consider the degree of burden and whether it "'beyond question' exceed[s] its benefits in combating the epidemic Texas now faces," is patent error. *In re Abbott*, No. 20-50264, 2020 WL 1685929, at *11 (5th Cir. Apr. 7, 2020).

**b.** Respondents respond with arguments this Court has already rejected. They claim that medication abortion simply involves ingesting a pill—no different from

taking aspirin—and thus does not consume much PPE or require many hospitalizations. But the record shows there is more to a medication abortion than simply taking a pill. Medication abortion involves a multi-step procedure that carries serious risks and occurs over several days, starting with an ultrasound and physical examination, two different medications spaced 24-48 hours apart, bleeding and painful cramping, expulsion of the fetus, and a follow-up examination to prevent infection by ensuring the abortion is complete. *See* Pet. 6-8.

The FDA agrees. It designates mifepristone as a "medication[] with serious safety concerns"[1] and "risks of serious complications," which is "available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the Mifeprex REMS Program."[2] To even become certified to prescribe mifepristone, providers must agree that they have the "ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation."[3] No one needs access to "medical facilities equipped to provide blood transfusions and resuscitation" to take an aspirin.

---

[1] FDA, *Risk Evaluation and Mitigation Strategies*, https://www.fda.gov/drugs/drug-safety-and-availability/risk-evaluation-and-mitigation-strategies-rems.

[2] Mifeprex label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.

[3] Mifeprex REMS, https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2019_04_11_REMS_Document.pdf.

Medication abortion is thus a multi-step procedure that must be considered holistically. The necessary ultrasound, physical examination, and follow-up examination all require PPE, and would be unnecessary but for the elective abortion taking place, which itself is medically unnecessary.[4] That makes these component parts of the medication-abortion process different from the examples given by the Texas Medical Board in its non-binding, informal FAQs.[5] Those were examples of individual procedures done in isolation from each other, not as essential component parts of a multi-stage elective procedure. *See* Pet'rs Letter Br. 3.

Moreover, the record demonstrates a substantial likelihood that a woman undergoing a medication abortion will require surgical follow-up, that is, a surgical abortion,[6] which undeniably consumes PPE, *see In re Abbott*, 2020 WL 1685929, at *11

---

[4] Respondents' argument that ultrasounds and office visits would occur anyway as part of prenatal care are undermined by Respondents' own evidence which shows that OB/GYNs are delaying or reducing in-office visits because of the COVID-19 pandemic. *See* App.375, 407. ACOG recommends a modified schedule involving only two in-person visits during the first 22 weeks of pregnancy. *See* ACOG, *Examples of Alternative or Reduced Prenatal Care Schedules* (Mar. 24, 2020), https://www.acog.org/clinical-information/physician-faqs/-/media/287cefdb936e4cda99a683d3cd56dca1.ashx (cited by Respondents' declarant at App.364).

[5] *Texas Medical Board (TMB) Frequently Asked Questions (FAQs) Regarding Non-Urgent, Elective Surgeries and Procedures During Texas Disaster Declaration for COVID-19 Pandemic* 3, http://www.tmb.state.tx.us/idl/59C97062-84FA-BB86-91BF-F9221E4DEF17.

[6] ACOG, *Medical Management of First-Trimester Abortion, Practice Bulletin 143* (2016), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2014/03/medical-management-of-first-trimester-abortion (medication abortions are incomplete and would require surgical intervention approximately 8% and up to 15% of the time, depending on gestation).

(there is "considerable evidence that surgical abortions consume PPE."). The FDA label itself asserts that up to 4.6% of medication abortions result in a visit to an emergency room and up to 0.6% of medication abortions can result in hospitalization.[7] *See* App.12. All this makes medication abortion a multi-step procedure materially distinguishable from isolated lab tests or physical examinations, none of which require surgical follow-up.

Because medication abortion is an elective procedure reasonably likely to consume PPE and reduce hospital capacity through its multi-step process and potential for surgical intervention, GA-09's temporary delay of medication abortions is thus a "reasonable response to a public crisis," *In re Abbott*, 2020 WL 1685929, at *12. At minimum, neither the district court nor Respondents have satisfied *Jacobson*'s "beyond question" standard. Mandamus should issue as to the injunction against enforcement of GA-09 as to medication abortions.

### 2. Any ambiguity in GA-09's scope as to medication abortions renders the TRO all the more impermissible.

This Court's previous order indicated that the record is unclear as to whether GA-09 applies to medication abortions, *see* Order Denying Stay 5, but that only *compounds* the district court's error. Either the district court correctly concluded that GA-09 applies to medication abortions—in which case, the TRO is patently unlawful as described above—or the district court misunderstood GA-09's application and

---

[7] *See* Mifeprex Label 8, *supra* note 2.

enjoined its enforcement gratuitously—in which case, the TRO is a manifestly improper abuse of jurisdiction. Either way, the district court clearly and indisputably erred.

**a.**    Federal courts exist to resolve questions of federal—not state—law. Yet the district court purported to find that "[m]edication abortion is not a surgery or procedure," App.469, and therefore beyond GA-09's scope as a matter of state law. To the extent the district court's TRO orders Petitioners to follow the district court's preferred understanding of state law, it "conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 106, 124-25 (1981). A federal court cannot order state officials to comply with state law. *Id.*; *see also Hughes v. Savell*, 902 F.2d 376, 377-78 & n.2 (5th Cir. 1990). Any order in violation of that bedrock principle of federalism is a manifest "judicial usurpation of power." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004) (cleaned up).

Petitioners briefed *Pennhurst* to the district court in their papers on the first TRO, App.204-05, and would have briefed it again as to the second TRO had the district court permitted Petitioners to file a brief. The violation of *Pennhurst* is another illustration of the district court's disregard of any limits on its jurisdiction.

**b.**    If GA-09's scope is indeed ambiguous as to medication abortions, then the district court had a duty to omit any discussion of medication abortions from its TRO. The Supreme Court has long and consistently held that district courts must abstain from deciding cases where a state-law question would "avoid or significantly

modify" the federal analysis. *Lake Carriers Ass'n v. MacMullan*, 406 U.S. 498, 512 (1972); *see R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 500 (1941).

If Respondents wish to litigate whether medication abortions fall under GA-09, there is a forum designed for that exact inquiry: state court. *See Reetz v. Bozanich*, 397 U.S. 82, 86 (1970); *Pullman*, 312 U.S. at 511. It is manifestly improper to ask a federal court to interfere with a state regulatory regime whose parameters may not even reach the plaintiff. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 360-61 (1989) (citation omitted); *Sierra Club v. City of San Antonio*, 112 F.3d 789, 793 (5th Cir. 1997). Such concerns are particularly salient given "the state's goal of protecting public health in the face of the COVID-19 pandemic." *In re Abbott*, 2020 WL 1685929, at *9.

Moreover, if GA-09 does not cover medication abortions, then there is no live case or controversy between the enforcers of GA-09 and those it regulates. *See Yarls v. Bunton*, 905 F.3d 905, 912 (5th Cir. 2018), *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). Even Respondents admit (at 32) that mandamus is proper "when the trial court has 'exceeded its jurisdiction.'" (Citation omitted.)[8]

In short, if GA-09 is ambiguous as to medication abortions, then the district court had a clear and unmistakable duty to abstain from entering extraordinary relief.

---

[8] Similarly, the second TRO's injunction against enforcing GA-09 as a "categorical ban against all abortions performed by Plaintiffs," App.477, exceeds the district court's jurisdiction because GA-09 explicitly excludes immediately medically necessary procedures, so it is not a categorical ban. App.220. Respondents have never argued otherwise.

And if GA-09 does not apply to medication abortions, then the district court plainly exceeded its jurisdiction. In all events, mandamus should issue.

### B. The TRO patently erred as to gestational-limit abortions.

1.     Texas bans abortions beyond 22 weeks LMP. *See* Tex. Health & Safety Code § 171.044. The district court reasoned that the State cannot ban surgical abortion for women who will pass 22 weeks LMP during GA-09's pendency. App.476-77. That was clear and indisputable error under *Roe* and *Casey*. Even if GA-09 affects a total deprivation of the right to surgical abortion as to some women, it remains a permissible policy decision designed to save the lives of the front-line healthcare workers battling the COVID-19 pandemic. It follows, under *Jacobson*'s "beyond standard" and this Court's previous orders, that mandamus should issue.

The district court should have followed this Court's instruction to consider *Planned Parenthood of Southeastern Pennsylvania v. Casey*. There, the Supreme Court held that "the independent existence" of a "second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman." 505 U.S. 833, 870 (1992) (plurality op.). That principle flows from *Roe* itself: "State regulation protective of fetal life after viability thus has both logical and biological justifications. . . . [The State] may go so far as to *proscribe* abortion during that period, except when it is necessary to preserve the life or health of the mother." 410 U.S. at 163-64 (emphasis added).

That is, the State may "proscribe" abortion—full stop—in order to protect "the independent existence" of a "second life" that is viable. That holding controls

here: Even if GA-09's delay works to "proscribe" abortion altogether in a small sub-set of women, the State may indeed do so to protect its legitimate interest in the lives of the front-line healthcare workers. No Supreme Court authority places the right to an elective surgical abortion above the lives of those workers.

That principle flows from *Casey* and *Roe* even *outside* the context of a public-health emergency. But the public-health emergency framework makes this a simpler question. As this Court has already explained, *Jacobson* confirms the State's power is at its zenith during a public-health emergency. *In re Abbott*, 2020 WL 1685929, at *15. Even rights explicitly protected by the Constitution's text must yield to public-safety requirements. *Id.* at *9; *see also, e.g.*, U.S. Const. amend. I (protecting "the right of the people peaceably to assemble"). The upshot from *Roe* and *Casey*—when read through the *Jacobson* lens—is that the power of the State is broad enough to delay all abortions as necessary to protect the lives of front-line healthcare workers, even if that delay means a deprivation of the constitutional right to abortion due to gestational age in a small number of cases.

**2.**   The district court also erred in granting injunctive relief as to women who may exceed the gestational limit before expiration of GA-09 or are approaching eighteen weeks' gestation and may not be able to reach an ASC. Respondents failed to proffer any "competent" evidence of particular women in that circumstance. *In re Abbott*, 2020 WL 1685929 at *11-12; *see* Stay Reply 7-9. Their mandamus response does not argue otherwise.

10

**C. The district court again failed to properly address jurisdictional defects, despite this Court's instruction.**

**1.** The TRO is improper because Respondents lack standing. Respondents' briefing does not explain how GA-09 "will affect *them*." *In re Gee*, 941 F.3d 153, 163-64 (5th Cir. 2019) (per curiam). That means it must point to evidence that, but for GA-09, it would perform each procedure for which it seeks an injunction. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996); *In re Gee*, 941 F.3d at 163-64. Respondents have offered nothing. That only underscores that the district court failed to conduct the "careful parsing of the evidence" necessary to permit injunctive relief. *In re Abbott*, 2020 WL 1685929, at *11.

**2.** The TRO against the Governor and the Attorney General is a manifest "usurpation of judicial power." *Cheney*, 542 U.S. at 380. Sovereign immunity and the lack of Article III standing bar the TRO, and such an "unlawful assertion of federal power over a matter of state sovereignty" warrants mandamus relief. *In re Gee*, 941 F.3d at 166; *see* No. 20-50264, Reply in Support of Mandamus 13 (Apr. 3, 2020). The district court refused to meaningfully engage with this question. Indeed, Respondents did not even brief it below. *See* App.420-35. They still add nothing to the facially implausible arguments Petitioners have repeatedly rebutted. *See* Pet. 22-25, Emergency Mot. to Stay 17-19, Stay Reply 9-10; No. 20-05264, Pet. for Writ of Mandamus 25-28 (March 30, 2020), Reply, *supra*, 11-13, Emergency Mot. to Stay TRO 16-18 (March 30, 2020), Reply in Support of Stay 8-10 (April 1, 2020).

## II.  The District Court's Refusal To Follow The Mandate Rule And The Law-Of-The-Case Doctrine Independently Justifies Mandamus Relief.

Finally, mandamus is warranted for an additional, independent reason: The district court violated the law-of-the-case doctrine and defied this Court's mandate. *See* Pet. 20-21.

**1.**  The mandate rule requires the district court to effect this Court's mandate and to do nothing else. *Deutsche Bank Nat'l Trust Co. v. Burke*, 902 F.3d 548, 551 (5th Cir. 2018) (per curiam). Relatedly, the law-of-the-case doctrine prevents a district court on remand from reexamining any issue of fact or law decided on appeal. *Ball v. LeBlanc*, 881 F.3d 346, 351 (5th Cir. 2018). The district court must implement "both the letter and the spirit" of the Court's mandate. *Id.*

**2.**  The Supreme Court has long held that appellate courts should wield their mandamus power when a lower court "refuse[s] or fail[s] to comply" with an appellate court's judgment, *Gen. Atomic Co.*, 436 U.S. at 497, or "disobeys and mistakes [the mandate's] meaning," *Vendo Co.*, 434 U.S. at 427. Indeed, this Court has described the law as "settled" that if a lower court misconstrues or "does not give full effect" to the mandate, mandamus is appropriate. *In re United States*, 207 F.2d 567, 570 (5th Cir. 1953). And the Eighth Circuit has held that in these circumstances, mandamus is not only available, but *required*. That is, this Court has "not only the power, but also a duty to enforce [its] prior mandate to prevent evasion." *In re Mid-American Energy Co.*, 286 F.3d 483, 486 (8th Cir. 2002) (per curiam); *see also Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by

the lower federal courts no matter how misguided the judges of those courts may think it to be.").

Consistent with those bedrock principles, appellate courts have "uniformly" granted mandamus relief when a district court has failed to adhere to an appellate court's order. *Citibank, N.A. v. Fullam*, 580 F.2d 82, 86-87 (3d Cir. 1978). As the First Circuit has noted, "[w]e know of no *adequate* means to correct the present misapplication or non-compliance with our mandate other than through the use of our mandamus power." *Dep't of Navy v. Fed. Labor Relations Auth.*, 835 F.2d 921, 923 (1st Cir. 1987).

The reasons underlying that practice are sound. A party who obtains a judgment after lengthy litigation should not have to go through that process again to enforce the judgment. *Gen. Atomic Co.*, 436 U.S. at 497. While this litigation has not yet been lengthy, it has been hard-fought, and the Court's first opinion was thorough. Petitioners should not have to wait to appeal a preliminary injunction to rectify the district court's failure to follow the mandate, especially given the time-sensitive nature of this case. Requiring Petitioners to "participate in the relitigation of issues already decided" by this Court prior to challenging the district court's actions on appeal would "encourage judicial anarchy." *See Dep't of Navy*, 835 F.2d at 923.

**3.**    This Court has already concluded that the district court's second TRO violates the mandate rule. Its opinion in *In re Abbott* required the district court to, at a minimum, (1) apply *Jacobson*, (2) carefully parse the evidence, and (3) refrain from usurping the State's authority during a public-health crisis. Order Denying Stay at 3-4; Order Granting Temporary Administrative Stay at 2-3; *see also In re Abbott*, 2020

WL 1685929, at *2, 11. But in granting the second TRO, the district court mentioned *Jacobson* only in passing, did not even cite any of Petitioners' evidence, did not hold a meaningful adversarial hearing, and again substituted its own view of what is best for Texas for that of the State's officials. App.464-79; Tr. of Telephone Call 7:12-8:21, *Planned Parenthood Center for Choice v. Abbott*, No. 1:20-cv-00323-LY (W.D. Tex. Apr. 9, 2020).

That is why Respondents' arguments about "targeted findings," Opp. 16, miss the point. The Court's instructions were to make targeted findings *after* a preliminary-injunction hearing during which all parties could present evidence. *In re Abbott*, 2020 WL 1685929, at *2, 13. The truncated process used by the district court—in which Petitioners were not permitted to respond—does not resemble in letter or spirit what this Court required. And that makes mandamus both warranted and necessary. *Gen. Atomic Co.*, 436 U.S. at 497; *Vendo Co.*, 434 U.S. at 427.

## III.  The Court Should Grant Mandamus Relief.

**A.** The Court has already found that, in light of the ongoing pandemic, Petitioners have no adequate remedy by appeal. *In re Abbott*, 2020 WL 1685929, at *13-15. Waiting for the preliminary-injunction process to play out as Respondents suggest (at 30) will cost valuable time when preparation for COVID-19 must occur now.

There were 8261 confirmed COVID-19 cases in Texas on April 7, when the Court issued its first mandamus opinion.[9] Eight days later, there are over 15,000.[10]

The only other argument Respondents make regarding adequacy is to reiterate the merits of their case, Opp. 30-32, which are erroneous for the reasons discussed above. *See supra* pp. 2-10.

**B.** Respondents' argument that mandamus is inappropriate because the TRO will expire on April 19 has been overtaken by events. Opp. 32. The district court has extended the TRO until May 1. *See* Order, No. 1:20-CV-00323-LY (W.D. Tex., issued Apr. 14, 2020). There is sufficient time for the Court to rule on the petition.

At bare minimum, even if this Court concludes that mandamus is unwarranted, it should issue a binding opinion to guide the district court during the preliminary-injunction proceedings. There is ample precedent to do so. *See, e.g.*, *In re JPMorgan Chase & Co.*, 916 F.3d 494, 504 (5th Cir. 2019); *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 348 (5th Cir. 2017); *see also In re Gee*, 941 F.3d 153. As this second mandamus has demonstrated, clear and explicit guidance from the Court is necessary.

---

[9] Tex. Dep't of State Health Servs., *Texas Case Counts COVID-19*, https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83.

[10] *Id.*

## Conclusion

The Court should grant the petition for writ of mandamus.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

Ryan L. Bangert
Deputy First Assistant
  Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Kyle D. Hawkins
Kyle D. Hawkins
Solicitor General
Kyle.Hawkins@oag.texas.gov

Heather Gebelin Hacker
Beth Klusmann
Natalie D. Thompson
Assistant Solicitors General

Counsel for Petitioners

16

## CERTIFICATE OF SERVICE

On April 15, 2020, this reply was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. A copy will be sent to Judge Lee Yeakel of the Western District of Texas. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Kyle D. Hawkins
KYLE D. HAWKINS

## CERTIFICATE OF COMPLIANCE

This reply complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 21(d) because it contains 3818 words, excluding the parts of the brief exempted by Rule 32(f), which is less than half the number of words permitted for a petition; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Kyle D. Hawkins
KYLE D. HAWKINS